## UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF GEORGIA

| | |
|---|---|
| AMY BRUNET, individually and on behalf of all others similarly situated, | |
| Plaintiff, | Case No. |
| v. | |
| GENERAL MOTORS LLC, GENERAL MOTORS HOLDINGS LLC, ONSTAR LLC, LEXISNEXIS RISK SOLUTIONS, INC., and VERISK ANALYTICS, INC., | **DEMAND FOR JURY TRIAL** |
| Defendants. | |

## CLASS ACTION COMPLAINT

Plaintiff Amy Brunet ("Plaintiff") complains upon knowledge as to herself and her own actions and upon information and belief as to all other matters against Defendants General Motors LLC ("General Motors" or "GM"), General Motors Holdings LLC ("GM Holdings"), OnStar LLC, ("OnStar"), LexisNexis Risk Solutions, Inc. ("LexisNexis"), and Verisk Analytics, Inc. ("Verisk") (collectively, "Defendants"), as follows:

## I.    SUMMARY OF ALLEGATIONS

1.    For many consumers, "[a] car, to its driver, can feel like a sanctuary. A place to sing favorite songs off key, to cry, to vent, or to drive somewhere no one

knows you're going."[1]

2.      But contrary to consumers' expectations, modern cars are instead "surveillance-machines on wheels souped-up with sensors, radars, cameras, telematics, and apps that can detect everything we do inside -- even where and when we do it."[2]

3.      Defendant General Motors has long manufactured and sold consumer vehicles in the United States and around the world, under well-known brand names like Chevrolet, GMC, Cadillac, and Buick.  The sale of these vehicles to consumers has historically constituted the bulk of GM's profits.

4.      As cars have increasingly become "computers on wheels" equipped with advanced software and GPS tracking, however, GM has found an additional way to profit from consumers: their driving data.

5.      Specifically, GM has deceived consumers like Plaintiff into sharing a wide array of their driving data, including location data, under the guise of improving users' driving safety—and then selling that data to third parties like LexisNexis and

---

[1]      Kashmir Hill, *Automakers Are Sharing Consumers' Driving Behavior With Insurance Companies*, N.Y. Times (Mar. 11, 2024), https://www.nytimes.com/2024/03/11/technology/carmakers-driver-tracking-insurance.html.

[2]      Jen Caltrider et al., *After Researching Cars and Privacy, Here's What Keeps Us Up at Night*, Privacy Not Included (Sept. 6, 2023), https://foundation.mozilla.org/en/privacynotincluded/articles/after-researching-cars-and-privacy-heres-what-keeps-us-up-at-night/.

Verisk for millions of dollars a year. GM engages in this practice despite an array of accuracy issues in the data it collects.

6.     LexisNexis and Verisk then sell this unreliable and decontextualized driving data to insurance companies—who in turn use the data to substantially increase consumers' auto insurance rates.

7.     Plaintiff is one of the millions of GM users whose driving data was collected and exploited by Defendants without her full knowledge and consent, and she has suffered significantly higher insurance rates as a result.

8.     Plaintiff brings this action on behalf of herself and members of the Classes (defined below) for statutory, actual, compensatory, consequential, punitive, and nominal damages, as well as restitution and/or disgorgement of profits unlawfully obtained, injunctive relief, and all other just and proper relief on behalf of all persons whose driving data was unlawfully captured, stored, and/or transferred or sold by Defendants without full notice or consent.

## II.     **PARTIES**

9.     Plaintiff Amy Brunet is a natural person and citizen of the State of Connecticut. Plaintiff purchased a GM-manufactured Cadillac Escalade from Herb Chambers Cadillac of Warwick in Warwick, Rhode Island, in March 2021. OnStar with Smart Driver has been installed and active on Plaintiff's vehicle from purchase through the present time. Plaintiff pays $34.99 per month for her subscription.

10.    Given that Plaintiff's data was collected through the Smart Driver service, she is informed and believes that her data, including location data and personal driving history, was sold to third parties such as LexisNexis, Verisk, and her own and other auto insurance companies.

11.    Plaintiff recognizes that many factors go into car insurance rates. However, Plaintiff is informed and believes that GM's and GM Holdings' sale of her personal data was a factor in increased auto insurance rates, and that she now pays more for auto insurance that she otherwise would have absent GM's and GM Holdings' sharing of her driving data without her consent.

12.    Defendant General Motors LLC is headquartered in Detroit, Michigan, and organized under the laws of Delaware.

13.    Defendant General Motors Holdings LLC is headquartered in Detroit, Michigan, and organized under the laws of Delaware.

14.    Defendant OnStar LLC is headquartered in Detroit, Michigan, and organized under the laws of Delaware.

15.    Defendant LexisNexis Risk Solutions Inc. is headquartered in Alpharetta, Georgia, and incorporated under the laws of Delaware.

16.    Defendant Verisk Analytics, Inc. is headquartered in Jersey City, New Jersey, and incorporated under the laws of Delaware.

## III.   JURISDICTION AND VENUE

17.    This Court has subject matter jurisdiction over this action pursuant to 28 U.S.C. §1332(d) & 1367 because: (i) this is a class action in which the matter in controversy exceeds the sum of $5,000,000, exclusive of interest and costs; (ii) there are 100 or more class members; and (iii) some members of the Classes are citizens of states different from some Defendants.

18.    The Court has personal jurisdiction over Defendants because Defendants have affirmatively established and maintained sufficient contacts with Georgia and conduct significant business in this State.

19.    Venue for this action is proper in this Court pursuant to 28 U.S.C. §1391 because a substantial part of the events, omissions, and acts giving rise to the claims herein occurred in this District.  Further, the principal place of business of Defendant LexisNexis is in this District.

## IV.   FACTUAL ALLEGATIONS

### GM & OnStar

20.    GM is one of the largest automobile manufacturers in the United States, and the world.  In 2023, GM sold roughly 2.6 million vehicles across the United States.[3]

---

[3]    Michael Wayland, *GM's 2023 U.S. Vehicle Sales Were Its Best Since 2019*, CNBC (Jan. 3, 2024), https://www.cnbc.com/2024/01/03/gm-2023-us-vehicle-sales.html.

21.    In the 1990s, GM entered into a partnership with several technology companies to form the OnStar Corporation, which would produce an embedded "telematics" system for use in GM vehicles.

22.    "Telematics," a term which came into widespread use with the introduction of OnStar, is a combination of "telecommunication" and "informatics," and describes services that provide information about a portable device via telecommunications networks.  Today telematics often describes vehicle systems that combine Global Positioning System ("GPS") and cellular technologies with onboard electronics.  They can include safety, communication, vehicle diagnostic and entertainment features.[4]

23.    The earliest versions of OnStar's telematics system would use a cellular connection to provide crash notification and security services to GM vehicle owners, on a subscription basis, i.e. OnStar's original purpose was to help troubled drivers and vehicle owners with location-specific assistance.[5]

24.    Over time, the services provided by OnStar for GM vehicle owners has dramatically expanded, and GM now offers customers subscription-based communications, in-vehicle security, emergency services, turn-by-turn navigation,

---

[4]    Shanna Freeman, *How OnStar Works*, HowStuffWorks, https://auto.howstuff works.com/onstar.htm (last accessed, June 5, 2024).

[5]    The Evolution of OnStar, https://www.onstar.com/why-onstar/evolution-of-onstar-innovations (last accessed, June 5, 2024).

and remote diagnostics mechanisms utilizing vehicles' onboard telematics system that GM markets under the "OnStar" brand.

25.     To provide these services, the hardware and wires comprising a vehicle's OnStar system can gather data from both the onboard diagnostics system and built-in location-tracking GPS functionality.  OnStar systems also use cellular technology to transmit vehicle and consumer data, as well as for voice communications.

26.     For example, OnStar can transmit GPS data through the cellular data connection to provide turn-by-turn directions to drivers, or to alert emergency services of a vehicle's location when it detects a crash.  OnStar can also transmit data collected from a driver's vehicle, such as transmitting a vehicle's mileage for insurance purposes, or providing vehicle health reports to GM.

27.     Further, OnStar can connect to a mobile application on a driver's mobile phone, which allows users to review data about their vehicle and enables users to control certain functions of their car remotely, such as unlocking doors or starting the vehicle.

### The OnStar Smart Driver Application

28.     In 2016, GM & OnStar launched a new use of OnStar's built in diagnostics and connectivity, titled OnStar Smart Driver ("Smart Driver").

29.     The Smart Driver service was pitched as a way for drivers to improve

their driving and reduce depreciation of their vehicles: "OnStar Smart Driver monitors and scores driver behavior, noting things like hard braking, hard acceleration, etc. Participants can receive feedback and tips to improve driving skills, which can help them maximize their vehicle's performance and reduce wear and tear on the vehicle."[6]

30.    When Smart Driver is turned on, a driver's vehicle will track and record all instances of "hard braking," "hard acceleration," driving without a seatbelt, driving over 80mph, and "late night driving" (defined as driving between 12am and 4am).  The vehicle will also record a user's fuel economy, distance driven, and average speed.  Together, these data points contribute to a driver's "driver score," which is meant as a benchmark for drivers to understand how their safe driving compares to other drivers.[7]

31.    Customers can enroll in OnStar services (including Smart Driver) at the time of vehicle purchase through their dealer, or at a later date, using either their myBuick, myChevrolet, myGMC or myCadillac mobile app(s), or by visiting their vehicle brand website: https://my.chevrolet.com, https://my.cadillac.com,

---

[6]    *Id.*

[7]    *Reading Into Your Chevrolet, Buick, GMC and Cadillac Smart Driver Score*, OnStar (Jan. 28, 2020), https://www.onstar.ca/en/tips/reading-into-your-smart-driver-score (addressing OnStar Smart Driver's operation in Canada, which largely mirrors its operation in U.S. vehicles)(last accessed, June 5, 2024).

https://my.buick.com, or https://my.gmc.com.  When a customer purchases OnStar through their dealer, the dealer may activate the system (including Smart Driver) prior to the customer taking possession of the vehicle.

32.    When a customer signs up to use OnStar services, the myBuick app, myChevrolet app, myGMC app, or myCadillac app, the customer enters into a contract with GM Holdings.

33.    OnStar is a subscription service, generally costing at least $29.99 per month (with premium plans costing up to $49.99 per month).[8]

34.    However, there is no charge for vehicle owners to enroll in OnStar Smart Driver.  Any customer owning a GM vehicle produced since 2015 can sign up for the service, and customers who subscribe to any of the paid OnStar plans can access an enhanced version of the service called "OnStar Smart Driver+."

### GM & OnStar Sell Driving Data to LexisNexis and Verisk, Who in Turn Sell Individualized Data to Insurance Companies

35.    Despite pitching Smart Driver as a free service for GM customers to improve their driving, GM, GM Holdings, and OnStar use customers' driving data for more than that—they also sell that driving data for their own financial gain.

36.    Since Smart Driver was introduced in 2016, GM and GM Holdings have bundled consumers' driving data—their driving scores, their location data, and

---

[8]    https://www.onstar.com/pricing (last accessed, June 5, 2024).

*every single instance* that a driver engages in hard braking, hard accelerating, driving at high speeds, and driving late at night—and market that data to consumer risk analysis companies like LexisNexis and Verisk.

37.     This bundling is unsurprising, given the substantial profit that can be made in the vehicle telematics market, which was estimated to be worth nearly $73 billion in 2022.[9]  Indeed, based on recent reporting on the practice, GM, GM Holdings, and OnStar make "millions" of dollars a year from illegal sales of their consumers' driving data.[10]

38.     These sales have been a central part of the OnStar Smart Driver service since its launch in 2016.  Just before Smart Driver launched, Verisk announced the creation of a "Verisk Telematics Data Exchange," which would allow manufacturers to share vehicle telematics data with insurance companies. In its first announcement about the exchange, Verisk highlighted that General Motors (and OnStar) would be its inaugural auto manufacturer partner in its new venture.[11]

39.     On information and belief, GM, GM Holdings, and OnStar use in-car

---

[9]     *Vehicle Telematics Market Size Worth USD 280.78 billion, Globally, by 2030 at a CAGR of 18.5%,* Yahoo! Finance, https://finance.yahoo.com/news/vehicle-telematics-market-size-worth-100500255.html (last accessed, June 5, 2024)

[10] Hill, *supra* note 1.

[11]     *Verisk Insurance Solutions Announces GM as Inaugural Auto Manufacturer to Join Telematics Data Exchange*, Verisk (Sept. 2, 2015), https://www.verisk.com/company/newsroom/archive/verisk-insurance-solutions-announces-gm-as-inaugural-auto-manufacturer-to-join-telematics-data-exchange/.

telematics equipment to intercept data about consumers' driving behavior and their location data from a given vehicle's on-board computer, transmit this data to a server, and then compile and sell consumers' data in bulk to the Verisk Telematics Data Exchange.

40.    Similarly, in 2017, LexisNexis launched the "LexisNexis Telematics Exchange," which was specifically built to provide a platform for insurance carriers and automotive manufacturers to share "telematics-based driving behavior data and vehicle insights."[12]   Since then, LexisNexis' platform has expanded dramatically, with 42% of the U.S. auto insurance market, including 5 of the top 10 insurers participating on the platform as of 2022.[13]

41.    On information and belief, GM, GM Holdings, and OnStar use in-car telematics equipment to intercept data about consumers' driving behavior and their location data from a given vehicle's on-board computer, transmit this data to a server, and then compile and sell consumers' data in bulk to the LexisNexis Telematics Exchange.

### *Drivers Face Increased Insurance Rates Due to Smart Driver Sharing Their Data*

42.    When risk analysis companies like LexisNexis or Verisk receive

---

[12]    *LexisNexis Telematics Exchange Celebrates 5-Year Anniversary*, LexisNexis Risk Solutions (June 28, 2022), https://risk.lexisnexis.com/about-us/press-room/press-release/20220628-telematics-exchange-5-year-anniversary.

[13] *Id.*

individualized driving data from a manufacturer like GM, that data is then "normalized and used to generate scores and attributes that are more easily ingested into insurance workflows to help better assess risk"—i.e., paint a clearer picture of a customer's driving history.[14]

43.    Having access to such a vast and detailed set of driving data and location data allows insurers to know far more than they ever have about the driving behavior of the insured—and consequently, price their customers' rates accordingly.

44.    LexisNexis boasts about the likelihood of rate hikes when insurers purchase data compiled from manufacturers like GM, promising insurers that they can "improve your ability to assess risk and capture otherwise missed premium."[15]

45.    Likewise, Verisk promises that its product "uses advanced analytics to transform raw trip and sensor data into insurance-ready insights," and compiles "rich, trip-level data from millions of vehicles . . . to give insurers purpose-built access to risk insights that support superior decision-making across the policy life cycle."[16]

---

[14]    *LexisNexis® Telematics OnDemand*, LexisNexis Risk Solutions, https://risk.lexisnexis.com/products/telematics-ondemand (last accessed Apr. 23, 2024).

[15]    *LexisNexis® Driving Behavior 360*, LexisNexis Risk Solutions, https://risk.lexisnexis.com/products/driving-behavior-360 (last accessed Apr. 23, 2024).

[16]    Michelle Pantina, *Verisk Remains Hyundai's Exclusive Provider of Telematics Data to Insurers*, Globe Newswire (Feb. 9, 2023), https://www.globenewswire.com/en/news-release/2023/02/09/2605077/0/en/Verisk-Remains-Hyundai-s-Exclusive-Provider-of-Telematics-Data-to-Insurers.html.

46.     GM vehicle owners and lease owners across the country—many of whom have never had a traffic violation or accident—are now facing drastically increased insurance rates as a result of GM's and GM Holdings' undisclosed sharing of their data with third parties and insurers, and even facing difficulty finding any insurance at all.

47.     A Chevrolet Bolt owner in Seattle, Washington, has never been responsible for an accident, and his insurance rates have long been stable as a result. But in 2022, his car insurance jumped nearly 21 percent due to an extensive 258-page driving report that his car's Smart Driver service had reported to LexisNexis, detailing 640 different trips he had taken in his Chevrolet vehicle.[17]

48.     Similarly, a Cadillac owner in Palm Beach County, Florida, had no issues finding affordable insurance for years.  But after his Cadillac started sharing his driving data with GM, he was denied auto insurance by seven different insurance companies.  When he finally found car insurance through a private insurance broker, his rate was nearly twice what he previously paid per month.[18]

49.     The data that Smart Drive collects from users is often decontextualized from the ways that vehicle owners can safely operate their vehicles at high speeds, and other supposed "red flags in the app."

---

[17]     Hill, *supra* note 1.

[18]     *Id.*

13

50.     One driver, for instance, racked up several "fast acceleration" warnings after he took his Chevrolet Corvette—which Chevrolet specifically markets as a high-speed sports car—to a "track day" where he tested out the Corvette's features on a professional racetrack.[19]

51.     Indeed, despite these real-world consequences of data from Smart Driver and similar programs being shared with third parties and insurers, the underlying data is fundamentally flawed, and in some cases is simply wrong about drivers' safe driving behavior.[20]

52.     For example, in large portions of the western United States, 80 mph is the standard speed limit on interstate highways,[21] but a driver operating their vehicle at those speeds will automatically be penalized with "high speed driving" by Smart Driver.

53.     Alternatively, when a driver encounters a child or animal suddenly enter the roadway, sudden braking is the appropriate defensive driving response in that scenario, but that driver will be penalized with "hard braking" by Smart Driver.

---

[19]     *Id.*

[20]     Jason Torchinsky, *Carmakers Are Sneakily Sharing Your Driving Data with Insurance Companies but What's Worse Is That the Data Is Crap*, Autopian (Mar. 19, 2024), https://www.theautopian.com/carmakers-are-sneakily-sharing-your-driving-data-with-insurance-companies-but-whats-worse-is-that-the-data-is-crap/.

[21]     *State Speed Limit Chart*, NATIONAL MOTORIST ASSOCIATION, available at https://ww2.motorists.org/issues/speed-limits/state-chart/ (last accessed May 11, 2024).

54.    Without this context, data that GM, GM Holdings, and OnStar sell to third parties is misleading, inaccurate, and bears little relationship to a user's actual safe driving abilities.

### *Drivers Never Consent to Sale of Their Driving Data*

55.    GM, GM Holdings, and OnStar engage in these data sharing practices despite *never* disclosing that they would share drivers' data in their privacy policies, terms and conditions of service, or other documents and webpages presented to customers, which precludes drivers from having any meaningful consent to the sharing of their data.

56.    For example, OnStar's frequently asked questions webpage (as of September 2023) contained no language about sharing drivers' data with third parties, beyond a statement that "OnStar doesn't share personally identifiable information with an insurance company without your express consent."[22]  Indeed, elsewhere on the page, OnStar strongly emphasized that Smart Driver information would never be shared with other drivers, and that OnStar took the security of drivers' data "very seriously."

57.    More broadly, the OnStar Privacy Statement from January 2023 notes that OnStar "may" share drivers' information with certain third-party companies, but

---

[22] *Help: Smart Driver* (FAQ), OnStar,  https://www.onstar.com/support /faq/smart-driver (last accessed, June 5, 2024).

only to "to develop, enhance, provide, service, maintain, and improve the safety, security, and quality of our products, programs, and services," as well as for product marketing. Nowhere does the Statement give OnStar users any warning that their driving data may be sold to risk assessors and insurers to better understand users' driving behavior.

58.     Even if OnStar's privacy policies and statements *did* include language noting that driving behavior was being sold to third parties, most users may easily miss the small links to the documents when registering through their app, or be unable to navigate to the documents when registering through their in-car infotainment system.

59.     Many users may also never have a chance to review these documents before Smart Driver starts collecting and sharing their driving behavior.  Some dealerships may sign up customers for OnStar trial services without their consent— in part due to a bonus structure for GM car salespeople that incentivizes OnStar signups.[23]  Some drivers may activate OnStar and related services via phone.  And some drivers may unknowingly purchase a used vehicle with OnStar capabilities (including Smart Driver) already activated.

## V.     **FRAUDULENT CONCEALMENT AND TOLLING**

60.     The applicable statutes of limitations are tolled as a result of Defendants'

---

[23]     Hill, *supra* note 1.

knowing and active concealment of their unlawful conduct—through, among other things, their deceptive language to consumers during the registration process for OnStar and Smart Driver, misleading public statements, and hidden and ambiguous privacy policies and terms of use. Plaintiff and the Classes were ignorant of the information essential to pursue their claims, without any fault or lack of diligence on their own part.

61.    Also, at the time the action was filed, Defendants were under a duty to disclose the true character, quality, and nature of their activities to Plaintiff and the Classes. Defendants are therefore estopped from relying on any statute of limitations.

62.    Defendants' fraudulent concealment is common to the Classes.

## VI.   CLASS ACTION ALLEGATIONS

63.    Plaintiff brings this action, individually, and on behalf of a class and subclass of similarly situated persons, pursuant to Fed. R. Civ. P. 23, defined as follows:

### Nationwide Class

All persons residing in the United States during the relevant class period that owned or leased a GM vehicle and whose driving data was collected and shared with a third party without their consent.

### Connecticut Subclass

All persons residing in Connecticut during the relevant class period that owned or leased a GM vehicle and whose driving data was collected and shared with a third party without their consent (the "Connecticut

Subclass").[24]

64.   Excluded from the Class and Connecticut Subclass (collectively, the "Classes") are: (1) any Judge presiding over this action and any members of their families; (2) Defendants, Defendants' subsidiaries, parents, successors, predecessors, and any entity in which Defendants or their parents have a controlling interest and their current or former employees, officers, and directors; (3) persons who properly execute and file a timely request for exclusion from the Classes; (4) persons whose claims in this matter have been finally adjudicated on the merits or otherwise released; (5) Plaintiff's counsel and Defendants' counsel; and (6) the legal representatives, successors, and assigns of any such excluded persons.

65.   **Ascertainability**. The Classes are readily ascertainable because they are defined using objective criteria so as to allow Class members to determine if they are part of the Classes. Further, the Classes can be readily identified through records maintained by Defendants.

66.   **Numerosity**. The Classes are so numerous that joinder of individual members herein is impracticable. The exact number of Class members, as herein identified and described, is not known, but publicly available information reveals that there are millions of GM vehicles in the United States.

67.   **Commonality**. Common questions of fact and law exist for each cause

---

[24]   Plaintiff reserves the right to modify or refine the definition of the Classes.

of action and predominate over questions affecting only individual Class members, including the following:

a)      whether Defendants engaged in the activities and practices referenced above;

b)      whether Defendants' activities and practices constitute a violation of the Connecticut Unfair Trade Practices Act, Conn. Gen. Stat. §§42-110A, *et seq*. ("CUTPA");

c)      whether Defendants' activities and practices constitute breach of contract;

d)      whether Defendants' activities and data collection practices constitute unjust enrichment concerning which restitution and/or disgorgement is warranted;

e)      whether Plaintiff and members of the Classes sustained damages as a result of Defendants' activities and practices, and, if so, in what amount;

f)      whether Defendants profited from their activities and practices, and, if so, in what amount;

g)      what is the appropriate injunctive relief to ensure that Defendants no longer unlawfully collect and sell data about Plaintiff and Class members' driving behavior; and

h)      what is the appropriate injunctive relief to ensure that Defendants

take reasonable measures to ensure that they and relevant third parties destroy

unlawfully-acquired driver data in their possession, custody or control.

68.   **Typicality**. Plaintiff's claims are typical of the claims of members of

the Classes because, among other things, Plaintiff and members of the Classes

sustained similar injuries as a result of Defendants' uniform wrongful conduct and

their legal claims all arise from the same events and wrongful conduct by Defendants.

Further, all Class members were subject to the collection of their driving data

through the Smart Driver service. Likewise, Defendants' misconduct impacted all

Class members in the same manner.

69.   **Adequacy**. Plaintiff will fairly and adequately protect the interests of

the Classes. Plaintiff's interests do not conflict with the interests of the Class

members, and Plaintiff has retained counsel experienced in complex class action and

data privacy litigation to prosecute this case on behalf of the Classes.

70.   **Predominance & Superiority**. Common questions of law and fact

predominate over any questions affecting only individual Class members, and a class

action is superior to individual litigation and all other available methods for the fair

and efficient adjudication of this controversy. The amount of damages available to

Plaintiff is insufficient to make litigation addressing Defendants' conduct

economically feasible in the absence of the class action procedure. Individualized

litigation also presents a potential for inconsistent or contradictory judgments, and

increases the delay and expense presented by the complex legal and factual issues of the case to all parties and the court system. By contrast, the class action device presents far fewer management difficulties and provides the benefits of a single adjudication, economy of scale, and comprehensive supervision by a single court.

71.   **Final Declaratory or Injunctive Relief**. Defendants have acted or refused to act on grounds that apply generally to the Classes, making final declaratory and/or injunctive relief appropriate with respect to the Classes as a whole.

72.   **Particular Issues**. The claims consist of particular issues that are common to all Class members and are capable of class-wide resolution that will significantly advance the litigation.  These issues include but are not limited to:

a)     whether Defendants unlawfully collected driving data from consumers;

b)     whether Defendants adequately disclosed their data collection practices to consumers;

c)     whether Defendants used dark patterns or deceptive practices to gain access to consumers' driving data as alleged herein;

d)     whether Defendants breached a contractual obligation to members of the Classes by violating the terms and conditions of OnStar and Smart Driver;

e)     whether Defendants failed to comply with its own policies and

applicable laws, regulations and industry standards relating to data collection and use; and

f)    whether Plaintiff and members of the Classes are entitled to actual damages, statutory damages, other injunctive relief, and/or punitive damages because of Defendants' wrongful conduct.

## VII.   CAUSES OF ACTION

### FIRST CAUSE OF ACTION
**Restitution / Unjust Enrichment**
**(On Behalf of the Plaintiff and the Nationwide Class**
**against GM, GM Holdings, and OnStar)**

73.    Plaintiff repeats and incorporates by reference paragraphs 1-72 as if fully set forth herein.

74.    Plaintiff and the Nationwide Class have conferred substantial benefits on GM, GM Holdings, and OnStar through their driving data, which was never intended for public consumption and use. Such benefits include but are not limited to the revenues and profits resulting from GM, GM Holdings, and OnStar's collection and sale and Plaintiff and Class members individual driving histories to third parties like LexisNexis and Verisk and, indirectly, insurance companies.

75.    GM, GM Holdings, and OnStar knowingly and willingly accepted and enjoyed these benefits.

76.    GM, GM Holdings, and OnStar either knew or should have known that the benefits rendered by the Plaintiff and the Nationwide Class were given through

misrepresentation and deception. For GM, GM Holdings, and OnStar to retain the aforementioned benefits under these circumstances is inequitable.

77.    Through deliberate violation of the Plaintiff's and the Nationwide Class's privacy interests, and statutory and constitutional rights, GM, GM Holdings, and OnStar each reaped benefits that resulted in each Defendant wrongfully receiving profits.

78.    Equity demands disgorgement of GM, GM Holdings, and OnStar's ill-gotten gains. GM, GM Holdings, and OnStar have been unjustly enriched and will continue to be unjustly enriched unless they are ordered to disgorge those profits for the benefit of the Plaintiff and the Nationwide Class.

79.    As a direct and proximate result of GM, GM Holdings, and OnStar's wrongful conduct and unjust enrichment, the Plaintiff and the Nationwide Class are entitled to restitution from GM, GM Holdings, and OnStar and institution of a constructive trust disgorging all profits, benefits, subscription fees, and other compensation obtained by GM, GM Holdings, and OnStar through this inequitable conduct.

**SECOND CAUSE OF ACTION**
**Breach of Contract**
**(In the Alternative, On Behalf of the Plaintiff and the**
**Nationwide Class Against GM, GM Holdings, and OnStar)**

80.    Plaintiff repeats and incorporates by reference paragraphs 1-72 as if fully set forth herein.

81.     Alternatively, to the extent GM, GM Holdings, and OnStar successfully assert that any terms of service form a binding contract that sufficiently defines the parties' rights regarding GM, GM Holdings, and OnStar's use of Plaintiff's and Nationwide Class members' location information, thereby rendering a claim for restitution or unjust enrichment unavailable (which Plaintiff denies in the first instance), then Plaintiff alleges that GM, GM Holdings, and OnStar's conduct constitutes a breach of any such binding contract.

82.     Specifically, to the extent that GM, GM Holdings, and OnStar's relationship with their users is governed by various terms of service and privacy statements, such as the GM Privacy Statement, terms of service for mobile apps like myChevrolet, and the OnStar Privacy Statement, these documents set forth explicit promises by GM, GM Holdings, and OnStar that customers' personally identifiable, confidential information would not be shared with insurance companies without their consent.

83.     For example, OnStar explicitly states that "OnStar doesn't share personally identifiable information with an insurance company without your express consent."

84.     GM and OnStar are third-party beneficiaries of GM Holdings' contract with GM vehicle owners.

85.     GM, GM Holdings, and OnStar breached these promises by

intercepting and collecting drivers' data and then packaging and selling that data to LexisNexis and Verisk.

86.     Plaintiffs and Nationwide Class members fulfilled their obligations under the relevant contracts and are not in breach of any relevant contracts.

87.     As a result of GM, GM Holdings, and OnStar's breach, they were able to acquire personal property of Plaintiff and Nationwide Class members and earn unjust profits.

88.     To the extent that Plaintiff and Nationwide Class members agreed to any such contract, they also failed to receive the benefit of the bargain for which they contracted and for which they paid valuable consideration in the form of (i) the personal information they agreed to share, which has ascertainable value to be proven at trial, and (ii) OnStar subscription payments.

89.     Plaintiff, on behalf of herself and Nationwide Class members, seeks compensatory damages, consequential damages, and/or non-restitutionary disgorgement, including disgorgement of subscription fees, in an amount to be proven at trial, and declarative, injunctive, or other equitable relief.

### THIRD CAUSE OF ACTION
**Restitution / Unjust Enrichment**
**(On Behalf of the Plaintiff and the Nationwide Class against LexisNexis and Verisk)**

90.     Plaintiff repeats and incorporates by reference paragraphs 1-72 as if fully set forth herein.

91.     Plaintiff and the Nationwide Class have conferred substantial benefits on LexisNexis and Verisk through their driving data, which was never intended for public consumption and use. Such benefits include but are not limited to the revenues and profits resulting from LexisNexis and Verisk's acquisition and packaging of consumers' driving data for sale to insurance companies.

92.     LexisNexis and Verisk knowingly and willingly accepted and enjoyed these benefits.

93.     LexisNexis and Verisk either knew or should have known that the benefits rendered by the Plaintiff and the Nationwide Class were given through misrepresentation and deception. For LexisNexis and Verisk to retain the aforementioned benefits under these circumstances is inequitable.

94.     Through deliberate violation of the Plaintiff's and the Nationwide Class's privacy interests, and statutory and constitutional rights, LexisNexis and Verisk each reaped benefits that resulted in each Defendant wrongfully receiving profits.

95.     Equity demands disgorgement of LexisNexis and Verisk's ill-gotten gains. LexisNexis and Verisk have been unjustly enriched and will continue to be unjustly enriched unless they are ordered to disgorge those profits for the benefit of the Plaintiff and the Nationwide Class.

96.     As a direct and proximate result of LexisNexis and Verisk's wrongful

conduct and unjust enrichment, Plaintiff and the Nationwide Class are entitled to restitution from LexisNexis and Verisk and institution of a constructive trust disgorging all profits, benefits, and other compensation obtained by LexisNexis and Verisk through this inequitable conduct.

### FOURTH CAUSE OF ACTION
**Invasion of Privacy**
**(On Behalf of Plaintiff and the Nationwide Class Against All Defendants)**

97.     Plaintiff repeats and incorporates by reference paragraphs 1-72 as if fully set forth herein.

98.     Plaintiff and the Nationwide Class hold, and at all relevant times held, a legally protected privacy interest in the personally-identifiable driving data that Defendants have scraped, packaged, and sold.

99.     There is a reasonable expectation of privacy concerning Plaintiff's and the Nationwide Class's data, location information, and driving records, under the circumstances present.

100.   The reasonableness of Plaintiff's and the Nationwide Class's expectation of privacy is supported by the undisclosed and hidden nature of Defendants' capture and sale of Plaintiff and the Nationwide Class's driving histories, through the use of dark patterns and otherwise.  Plaintiff's and the Nationwide Class's expectation is particularly reasonable in light of the stated (deceptive) purpose of the Smart Driver program and corresponding promises in documents and

webpages.

101.   Defendants' conduct constitutes and, at all relevant times, constituted a serious and offensive invasion of privacy, as Defendants either did not disclose at all, or failed to make an effective disclosure, that they would take and make use of— and allow third-party companies to take and make use of—Plaintiff's and the Nationwide Class's private and personally identifiable data and content. Defendants intentionally invaded Plaintiff's and the Nationwide Class's privacy interests by intentionally designing a service to surreptitiously obtain, improperly gain knowledge of, review, retain, package, and sell their confidential driving history.

102.   These intrusions are highly offensive to a reasonable person, as evidenced by substantial research, literature, and governmental enforcement and investigative efforts to protect consumer privacy against surreptitious technological intrusions.

103.   The offensiveness of Defendants' intrusion is heightened by Defendants' making Plaintiff's and the Nationwide Class's private and personally identifiable data and content available to third parties for a prolonged amount of time, without any notice. The offensiveness of Defendants' intrusion is further heightened by Defendants' deceptive promises that hid the true profit-seeking motive behind the Smart Driver program. Further, Defendants' conduct targeted Plaintiff's and the Nationwide Class's cars and driving histories, which commentators have referred to

as consumers' "sanctuaries," and record Plaintiff's and the Nationwide Class's highly private personally identifiable data and behavior.

104.   Plaintiff and the Nationwide Class were harmed by, and continue to suffer harm as a result of, the intrusion as detailed throughout this Complaint.

105.   Defendants' conduct was a substantial factor in causing the harm suffered by Plaintiff and the Nationwide Class.

106.   As a direct and proximate result of Defendants' unlawful invasions of privacy, Plaintiff's and Nationwide Class members' reasonable expectations of privacy were frustrated and defeated. Defendants' unlawful invasions of privacy damaged Plaintiff and Nationwide Class members as set forth above, and they are entitled to appropriate relief.

107.   Plaintiff and the Nationwide Class seek nominal, compensatory, and punitive damages as a result of Defendants' actions. Punitive damages are warranted because Defendants' malicious, oppressive, and willful actions were calculated to injure Plaintiff and the Nationwide Class and were made in conscious disregard of their rights. Punitive damages are also warranted to deter Defendants from engaging in future misconduct.

108.   Plaintiff and the Nationwide Class seek injunctive relief to rectify Defendants' actions, including, but not limited to, requiring Defendants to stop collecting driving history for sale to third parties; make clear disclosures of which

data is actually necessary to provide information to improve drivers' safety; obtain Plaintiff's and the Nationwide Class's full and informed consent prior to the collection of confidential driving information; stop transferring Plaintiff's and the Nationwide Class's private and personally identifiable data to third parties; and to recall and destroy Plaintiff's and the Nationwide Class's private and personally identifiable data already taken in contravention of Plaintiff's and the Nationwide Class's right to privacy under the common law.

109.   A person acting in conscious disregard of the rights of another is required to disgorge all profit because disgorgement both benefits the injured parties and deters the perpetrator from committing the same unlawful actions again. Disgorgement is available for conduct that constitutes "conscious interference with a claimant's legally protected interests," including tortious conduct or conduct that violates another duty or prohibition. Restatement (3rd) of Restitution and Unjust Enrichment, §§40, 44. Plaintiff and the Nationwide Class seek restitution and disgorgement for Defendants' violation of their privacy rights.

**FIFTH CAUSE OF ACTION**
**Violation of the Connecticut Unfair Trade Practices Act, Conn. Gen. Stat.**
**§§42-110a, *et seq* ("CUTPA")**
**(On Behalf of Plaintiff and the Connecticut Class Against All Defendants)**

110.   Plaintiff repeats and incorporates by reference paragraphs 1-72 as if fully set forth herein.

111.   Plaintiffs and members of the Connecticut Class are "persons" as

defined by Conn. Gen. Stat. §§42-110a.

112.   Defendants are engaged in trade and commerce as defined by Conn. Gen. Stat. §§42-110a because they extensively market and sell their products within Connecticut.

113.   Defendants' representations, as alleged above, were and are material to a reasonable consumer and are likely to affect consumer behavior and conduct.

114.   Defendants' act and practices offended public policy and violate numerous state and federal laws, including but not limited to the Fair Credit Reporting Act ("FCRA"), 15 U.S.C. §1681, *et seq*.

115.   Defendants' intentional deception of consumers is and was immoral, unethical, oppressive, and unscrupulous.

116.   Defendants' conduct has caused and continues to cause substantial injury to Plaintiff, Connecticut consumers, and others because, as alleged above, consumers unwittingly had their private driving data transmitted to third parties without their informed consent. That injury is not outweighed by any countervailing public policy that could justify Defendants' deceptive practices.

117.   Because Plaintiff and Connecticut consumers reasonably relied on Defendants' misrepresentations about OnStar and Smart Driver, they could not have reasonably avoided that injury.

118.   Defendants' conduct has not resulted in any benefit to consumers or competition.

119.   Defendants' unfair and deceptive practices directly, foreseeably, and proximately caused Plaintiff and Connecticut Class members an ascertainable loss because those consumers paid higher car insurance rates as a result of their driving data being misused and misinterpreted by insurance companies.

120.   Plaintiff and Connecticut Class members are entitled to damages and other relief.

**SIXTH CAUSE OF ACTION**
**Violation of the Fair Credit Reporting Act, 15 U.S.C. §1681 *et seq.***
**(On Behalf of the Plaintiff and the Nationwide Class against LexisNexis and Verisk)**

121.   Plaintiff repeats and incorporates by reference paragraphs 1-72 as if fully set forth herein.

122.   Plaintiff brings this claim on behalf of herself and all similarly situated Nationwide Class members nationwide.

123.   Plaintiff and the Nationwide Class members are each a "person" and a "consumer" within the meaning of the Fair Credit Reporting Act ("FCRA"). 15 U.S.C. §1681a(c).

124.   LexisNexis and Verisk are each individually a "consumer reporting agency" within the meaning of the FCRA. 15 U.S.C. §1681a(f).

125.   When a consumer reporting agency like LexisNexis or Verisk prepares

a consumer report, FCRA requires the agency to follow reasonable procedures to assure maximum possible accuracy of the information concerning the individual described in the report.  15 U.S.C. §1681e(b).

126.   LexisNexis and Verisk failed to maintain reasonable procedures to maintain maximum possible accuracy regarding Plaintiff and the Nationwide Class members' driver behavior data before disseminating it to auto insurance carriers.

127.   Auto insurance carriers who received this information from LexisNexis and Verisk obtained and sold an inaccurate representation of Plaintiff and the Nationwide Class members through their driver behavior data.

128.   The foregoing acts and omissions constitute willful or negligent violations of the FCRA, including but not limited to 15 U.S.C. §1681e(b).

129.   As a result of each willful violation of the FCRA, Plaintiff and Nationwide Class members are entitled to actual and statutory damages pursuant to 15 U.S.C. §1681n(a)(1), punitive damages pursuant to 15 U.S.C. §1681n(a)(2), and reasonable attorneys' fees and costs pursuant to 15 U.S.C. §1681n(a)(3) from LexisNexis and Verisk.

130.   As a result of each negligent noncompliance with the FCRA, Plaintiff and the Nationwide Class members are entitled to actual damages pursuant to 15 U.S.C. §1681o(a)(1) and reasonable attorneys' fees and costs pursuant to 15 U.S.C. §1681o(a)(2) from LexisNexis and Verisk.

## VIII.  **PRAYER FOR RELIEF**

WHEREFORE, Plaintiff respectfully requests for herself and all others similarly situated, the following relief:

a.      an order certifying this action as a class action, defining the Classes as requested herein, appointing the undersigned as Class Counsel, and finding Plaintiff to be the proper representative of the Classes;

b.      a permanent injunction and any other equitable relief as necessary to protect the interest of the Classes, including:

      i.      an order declaring Defendants' conduct alleged herein unlawful and prohibiting Defendants from engaging in the wrongful and unlawful acts in the future; and

      ii.      requiring Defendants to develop and adopt appropriate security protocols to protect vehicle owners', lessees', and users' personal information, and privacy;

c.      an award to Plaintiff and the Nationwide Class and/or Connecticut Class members of all recoverable damages, including statutory, actual, compensatory, consequential, punitive, and nominal damages, as well as restitution and/or disgorgement of profits and subscription fees unlawfully obtained;

d.      an award of attorneys' fees and costs recoverable under the claims pleaded herein; and

34

     e.     an order entering any other relief as is just and proper.

## IX.   <u>DEMAND FOR JURY TRIAL</u>

Plaintiff demands a trial by jury on all issues so triable.


Dated: June 6, 2024        By:  **BARNES LAW GROUP, LLC**


                      */s/ Roy E. Barnes*
                      Roy E. Barnes
                      Georgia Bar. No. 039000
                      John R. Bevis
                      Georgia Bar. 056110
                      J. Cameron Tribble
                      Georgia Bar No. 754759
                      31 Atlanta Street Marietta, GA 30060
                      Telephone: (770) 227-6375
                      Facsimile: (770) 227-6373
                      roy@barneslawgroup.com
                      bevis@barneslawgroup.com
                      ctribble@barneslawgroup.com


                      **SCOTT+SCOTT ATTORNEYS AT LAW LLP**


                      */s/ Joseph P. Guglielmo*
                      Joseph P. Guglielmo*
                      The Helmsley Building
                      230 Park Avenue, 17th Floor
                      New York, NY 10169-1820
                      Telephone: (212) 223-6444
                      Facsimile:  (212) 223-6334
                      jguglielmo@scott-scott.com

Joe Pettigrew, *Of Counsel*\*
600 W. Broadway + Suite 3300
San Diego, CA 92101
Telephone: (619) 233-4565
Facsimile: (619) 233-0508
jpettigrew@scott-scott.com


*\* Application for Pro hac vice*
*forthcoming*

**Attorneys for Plaintiff**
**and the Proposed Classes**